IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**JULIAN PRICE,** *personal representative*  **PLAINTIFF**
*of the Estate of Marshall Price, Deceased*

v.   Case No. 3:24-cv-00159-LPR

**GREENE COUNTY, ARKANSAS; STEVE FRANKS,** *in his Individual and Official Capacities*; **JAMIE FLOYD,** *in his Individual and Official Capacities*; **GREENE COUNTY SHERIFF'S DEPARTMENT; GREENE COUNTY JAIL; ANTHONY CARTER,** *Supervisor, Turn Key Health Clinics, LLC*; **BAILEY CROCKER,** *Individually and as Employee of Turn Key Health Clinics, LLC*; **BRIANNA FOSTER,** *Individually and as Employee of Turn Key Health Clinics, LLC*; **TURN KEY HEALTH CLINICS, LLC; and JOHN DOES 1–10**   **DEFENDANTS**

**ORDER**

This civil case involves the death of an inmate (Marshall Price) at the Greene County Detention Center.[1] His daughter, who is the personal representative of Mr. Price's estate, brings various claims against Greene County, Arkansas, Steve Franks, Jamie Floyd, Turn Key Health Clinics, LLC, Anthony Carter, Brianna Foster, and Bailey Crocker.[2] At the time in question: (1) Mr. Franks was the Sheriff of Greene County and Mr. Floyd was a Deputy Sheriff; (2) Turn Key Health Clinics, LLC was the organization with which the Greene County Detention Center contracted to provide medical care to inmates; and (3) Mr. Carter, Ms. Foster, and Ms. Crocker were employees of Turn Key and nurses at the Greene County Detention Center.[3]

---

[1] See Am. Compl. (Doc. 15) at 2.

[2] *Id.* ¶¶ 7–8.

[3] *Id.* ¶ 8. Sheriff Franks and Deputy Floyd are sued in their individual and official capacities. *Id.* at 1. The official-capacity claims against them will be treated as claims against Greene County itself. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). Mr. Carter, Ms. Crocker, and Ms. Foster are sued individually and in their capacities as employees of Turn Key. *See* Am. Compl. (Doc. 15) at 1. The latter set of claims will be treated as claims against Turn Key itself. *See Williams v. Turn Key Health*, No. 23-CV-513, 2023 WL 11195459, at *2 (E.D. Ark. Oct. 16,

Sheriff Franks and Greene County have filed a joint Answer.[4] Deputy Floyd has not responded at all.[5] Turn Key and its three employees have filed a Motion to Dismiss.[6] It is that Motion to which the Court now turns. The Motion is fully briefed and the Court has no need for oral argument. For the reasons discussed, the Court GRANTS IN PART and DENIES IN PART the Motion.

## BACKGROUND

On a motion to dismiss, the Court must read the record in a very particular way. The Court must accept as true all fact allegations in the Complaint.[7] But the Court need not, and should not, accept as true conclusory assertions (whether they be of law or fact).[8] The following background section conforms to these rules.

The story starts in earnest on December 7, 2022. Both before and on that date, Mr. Price was an inmate at the Greene County Detention Center.[9] It is not clear if he was serving a sentence there or if he was being detained pending trial. In any event, shortly before 11:00 AM that morning, an unknown person made an intercom call notifying jail employees that Mr. Price was having a

---

2023), *report and recommendation adopted by Williams v. Turn Key Health*, No. 23-CV-00513, 2024 WL 1799878 (E.D. Ark. Apr. 25, 2024). *Cf. Monell*, 436 U.S. at 690 n.55. Plaintiff also brought claims against the Greene County Sheriff's Department and the Greene County Jail that were dismissed in a previous Order. *See* Order (Doc. 29).

[4] Answer to Am. Compl. (Doc. 18).

[5] *See generally Price v. Greene Cnty.*, 3:24-cv-00159-LPR (E.D. Ark. filed Sep. 17, 2024) (docket sheet). Neither Sheriff Franks/Greene County's original Answer nor their Answer to the Amended Complaint was filed on behalf of Deputy Floyd. *See* Answer (Doc. 4) at 1; Answer to Am. Compl. (Doc. 18) at 1. The same is true of any previously filed or currently pending Motion to Dismiss. *See* Greene County Mot. to Dismiss (Doc. 5) at 1; Greene County Second Mot. to Dismiss (Doc. 19) at 1. Plaintiff is ordered to inform the Court, within 14 days of the date of this Order, whether she has properly and timely served Deputy Floyd.

[6] Doc. 16.

[7] *See Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002) ("While the court must accept allegations of fact as true when considering a motion to dismiss, the court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations.").

[8] *See id.*

[9] *See* Am. Compl. (Doc. 15) ¶ 13.

medical emergency.[10] At 10:53 AM, several jail employees and Nurse Crocker came to Mr. Price's cell.[11] At around 10:55 AM, Mr. Price was transported to the medical unit.[12] The Amended Complaint does not allege which specific Defendants Mr. Price saw at the medical unit or which specific Defendants knew of his ailments at this time. But we know that Nurse Crocker either saw Mr. Price or at least knew the specifics of his 11:00 AM visit. That is because Nurse Crocker filled out a medical report regarding this visit.[13]

At the 11:00 AM visit to medical, Mr. Price explained that he had a one-inch gash to the back of his head.[14] (The existence and size of the gash is confirmed by the videos attached to the

---

[10] *Id.* ¶ 14.

[11] *See* Ex. 1 (Day Room Dec. 7th Video) to Am. Compl. (Doc. 15) at 10:53:15.215 AM–10:53:57.668 AM. The videos attached to the Amended Complaint do not identify most of the people present in this first interaction. But we can clearly see Nurse Crocker in this first interaction. We know it is Nurse Crocker because she is wearing the same clothes as she is wearing in a subsequent video where she is identified. *Compare id.*, *with* Ex. 2-D (Marshall Price Videos, Copy of Newsweek Video Release) to Am. Compl. (Doc. 15). Importantly, the Amended Complaint does not allege that any of the persons on the videos are Nurse Carter or Nurse Bailey. And the videos themselves don't identify anyone by name except for Nurse Crocker and Deputy Floyd. *See* Ex. 2-D (Marshall Price Videos, Copy of Newsweek Video Release) to Am. Compl. (Doc. 15) at 2:51.

[12] *See* Ex. 1 (Day Room Dec. 7th Video) to Am. Compl. (Doc. 15) at 10:55:39.722 AM–10:55:49.696 AM; *see also* Am. Compl. (Doc 15) ¶ 15.

[13] *See* Ex. 1 (Nurse Crocker Notes) to Mot. to Dismiss (Doc. 16-1) at 1. Contrary to Plaintiff's arguments, *see* Resp. in Opp'n to Mot. to Dismiss (Doc. 25) ¶ 3, and except as discussed *infra* note 22, the Court can consider this medical report even though we are only at the motion to dismiss stage. In her Amended Complaint, Plaintiff alleged that: (1) at the 11:00 AM visit to medical, Mr. Price's "blood pressure was taken *and recorded* to be 70/60"; (2) Mr. Price's blood pressure was eventually "rechecked" and "*recorded* . . . to be 82/62"; (3) Mr. Price was "returned to his cell and told to increase his fluids to avoid dehydration"; and (4) "*[o]bservation notes indicate* [Mr. Price] was dizzy, faint, short of breath and disoriented." Am. Compl. (Doc. 15) ¶ 15 (emphasis added). Plaintiff was quite obviously and expressly referencing the medical notes that can be found in Exhibit 1 to the Motion to Dismiss. *See* Ex. 1 (Nurse Crocker Notes) to Mot. to Dismiss (Doc. 16-1) at 1. The Court may consider on a motion to dismiss documents (like the ones considered here) that are encompassed within or expressly referenced by the Complaint. *See Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) ("When deciding a motion to dismiss, a court may consider the complaint and documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." (quoting *In re Syntex Corp. Sec. Litig.*, 93 F.3d 922, 926 (9th Cir. 1996))); *see also Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017); *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) ("The contents of the Notice of Seizure and Intent to Forfeit Vehicle and the letter by Golden Valley's attorney . . . were alleged in the complaint and thus necessarily embraced by the complaint."); *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1063 n.3 (8th Cir. 2005) ("We may examine the press release in our consideration of the 12(b)(6) motion to dismiss, even though it was not expressly part of the pleadings, because it was incorporated into the pleadings by reference . . . .").

[14] *See* Ex. 1 (Nurse Crocker Notes) to Mot. to Dismiss (Doc. 16-1) at 1.

3

Amended Complaint.[15]) Mr. Price told medical that the injury came from falling in his cell and hitting his head on his bunk.[16] Mr. Price was bleeding slightly from the head wound.[17] He was sweating profusely, pale in color, dizzy, faint, short of breath, and disoriented.[18] Initially, his blood pressure was 70/60, his pulse was 98, his temperature was 97.6, his oxygen level was 99%, and his respirations per minute was 20.[19] After ten minutes, his blood pressure increased to 82/62.[20]

Notwithstanding the foregoing, Mr. Price was not provided "medical attention of any kind . . . ."[21] Instead, he "was returned to his cell . . . [,] told to increase his fluids to avoid dehydration," told to rest, and told to stand up slowly until he felt better.[22] Mr. Price "verbalize[d]" his "understanding of [these] instructions."[23] He was returned to his cell at around 11:26 AM.[24]

---

[15] *See* Ex. 2-D (Marshall Price Videos, Copy of Newsweek Video Release) to Am. Compl. (Doc. 15) at 0:49.

[16] Ex. 1 (Nurse Crocker Notes) to Mot. to Dismiss (Doc. 16-1) at 1.

[17] *Id.*

[18] *Id.*

[19] *Id.*; *see also* Am. Compl. (Doc. 15) ¶ 15.

[20] Ex. 1 (Nurse Crocker Notes) to Mot. to Dismiss (Doc. 16-1) at 1; Am. Compl. (Doc. 15) ¶ 15.

[21] Am. Compl. (Doc. 15) ¶ 15.

[22] *Id.*; Ex. 1 (Nurse Crocker Notes) to Mot. to Dismiss (Doc. 16-1) at 1. The medical report suggests that Mr. Price was given electrolytes to drink, that his head wound (and a foot wound) was cleaned, and that an EKG was performed. *See* Ex. 1 (Nurse Crocker Notes) to Mot. to Dismiss (Doc. 16-1) at 1. These specific portions of the report expressly contradict the no-treatment-of-any-kind allegations that Plaintiff makes in the Amended Complaint and thus cannot be considered on a motion to dismiss. The Court may only consider the documents attached to the Motion to Dismiss to the extent they are consistent with (or at least not expressly contradicted by) the operative Complaint's allegations. *See Zean*, 858 F.3d at 526 ("It is generally true that the district court must convert a Rule 12(b)(6) motion into one for summary judgment if it considers evidence 'in opposition to the pleading.'" (quoting *BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 688 (8th Cir. 2003))).

Given the foregoing, it is worth noting how the Court will treat other Exhibits (or portions of Exhibits) for purposes of deciding the instant Motion. The Court will consider the second page of Exhibit 1 (Nurse Crocker Notes) and all of Exhibit 4 (Offsite Notification) to the Motion to Dismiss. Those documents are medical reports concerning Mr. Price's afternoon status, and they are encompassed by or referenced in the operative Complaint. But the Court will not consider Exhibit 2 (EKG Report) or Exhibit 3 (Medical Intake Report). These documents directly contradict the no-treatment-of-any-kind allegations made in the Amended Complaint.

[23] *See* Ex. 1 (Nurse Crocker Notes) to Mot. to Dismiss (Doc. 16-1) at 1.

[24] *See* Ex. 1 (Day Room Dec. 7th Video) to Am. Compl. (Doc. 15) at 11:26:16.463 AM–11:26:30.645 AM.

4

It appears from watching the video exhibits that no nurse or jail employee checked on Mr. Price for the next five hours. At 4:32 PM, jail staff and Nurse Crocker visited Mr. Price's cell.[25] Mr. Price was in bed and mumbling.[26] He was helped out of bed and into a wheelchair.[27] He was helped to sit up in that wheelchair and then wheeled out of his cell.[28] Outside the cell, Nurse Crocker tried to determine what was wrong with Mr. Price.[29] Mr. Price was generally non-responsive, mumbling, groaning in apparent pain, exhibiting abnormal breathing patterns (reminiscent of hyperventilation), profusely sweating, and pale.[30] Nurse Crocker and others spent about ten minutes trying to determine what was going on with Mr. Price and whether he was faking his ailments.[31] This included repeated attempts to get Mr. Price to speak and repeated arm lifts and drops to judge his muscle control and reflexes.[32]

At 4:41 PM, Mr. Price was wheeled out of his cell block to be taken to the medical unit.[33] Again, we do not know from the operative Complaint which (if any) defendants he saw at the

---

[25] *See id.* at 4:32:04.310 PM–4:34:00.974 PM. Most of the people who participated in this afternoon interaction are not identified. But Nurse Carter and Deputy Floyd are identified by name on one of the videos attached to the operative Complaint. *See* Ex. 2-D (Marshall Price Videos, Copy of Newsweek Video Release) to Am. Compl. (Doc. 15) at 2:51.

[26] Ex. 2-D (Marshall Price Videos, Copy of Newsweek Video Release) to Am. Compl. (Doc. 15) at 0:40–0:43.

[27] *Id.* at 0:46–1:05.

[28] *Id.* at 1:05–1:13.

[29] *Id.* at 1:09–2:18.

[30] *Id.*

[31] *See* Ex. 1 (Day Room Dec. 7th Video) to Am. Compl. (Doc. 15) at 4:33:10.941 PM–4:41:25.973 PM.

[32] *See* Ex. 2-D (Marshall Price Videos, Copy of Newsweek Video Release) to Am. Compl. (Doc. 15) at 1:09–3:32. Deputy Floyd noted to Nurse Crocker that Mr. Price had spoken when Deputy Floyd helped Mr. Price out of bed. *See id.* at 2:17–2:20. Although Deputy Floyd said he and Mr. Price had a full conversation, the video reveals that not to be the case. Mr. Price essentially grunted an "ok" to Deputy Floyd, but nothing more substantive than that. *See id.* at 0:37–1:12. Nonetheless, given what Deputy Floyd told Nurse Crocker, Nurse Crocker appeared to suspect that Mr. Price was artificially limiting his communication with her to make things seem worse than they were. Nurse Crocker even said to Mr. Price: "So you were talking before I came down here? Okay. Well, we're not doing this, so you're gonna look at us and you're gonna tell us what's going on, or we can put you back in the cell." *Id.* at 2:22–2:30.

[33] *See* Ex. 1 (Day Room Dec. 7th Video) to Am. Compl. (Doc. 15) at 4:41:25.973 PM–4:41:57.973 PM; Am. Compl. (Doc. 15) ¶ 16.

medical unit other than Nurse Crocker.[34] His blood pressure was 60/40.[35] And no pulse or oxygen readings could be obtained.[36] Nurse Carter was then contacted and he ordered Mr. Price to be taken to the hospital.[37] Mr. Price was taken to the sallyport around 5:04 PM.[38] Because he could not physically get into the jail van, an ambulance was called.[39] It is not clear when the ambulance was called. But it must have been before 5:12 PM, because that is when the EMTs first arrived on the scene.[40] (The actual ambulance is first seen on video at 5:15 PM.[41])

At 5:15 PM, the EMTs started CPR.[42] At 5:20 PM, they moved Mr. Price to the ambulance.[43] Mr. Price was taken to the emergency room at Arkansas Methodist Medical Center.[44] He died at 2:08 AM on December 8, 2022.[45] This lawsuit followed.

Armed with the factual background as we must read it at this stage of the proceedings,[46] we can now proceed to analyze the arguments made by the parties in favor of and against dismissal.

---

[34] *See* Ex. 1 (Nurse Crocker Notes) to Mot. to Dismiss (Doc. 16-1) at 2.

[35] Am. Compl. (Doc. 15) ¶ 16.

[36] *Id.*; Ex. 1 (Nurse Crocker Notes) to Mot. to Dismiss (Doc. 16-1) at 2.

[37] *See* Ex. 1 (Nurse Crocker Notes) to Mot. to Dismiss (Doc. 16-1) at 2.

[38] Ex. 3 (Sally Port Dec. 7th Video) to Am. Compl. (Doc. 15) at 5:04:51.695 PM.

[39] *See* Ex. 1 (Nurse Crocker Notes) to Mot. to Dismiss (Doc. 16-1) at 2.

[40] *See* Ex. 3 (Sally Port Dec. 7th Video) to Am. Compl. (Doc. 15) at 5:12:06.218 PM. The Amended Complaint alleges that the ambulance was not called until 5:30 PM. Am. Compl. (Doc. 15) ¶ 18. But that cannot possibly be true given what is plainly visible in one of the videos that Plaintiff attached to the Amended Complaint. *See* Ex. 3 (Sally Port Dec. 7th Video) to Am. Compl. (Doc. 15) at 5:15:50.866 PM. In this situation, the Court does not have to accept 5:30 PM as the time the ambulance was called. *See Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019) (stating that, when deciding a motion to dismiss, there is no need to adopt plaintiff's version of facts if it is blatantly contradicted by video evidence).

[41] *See* Ex. 3 (Sally Port Dec. 7th Video) to Am. Compl. (Doc. 15) at 5:15:50.866 PM.

[42] *Id.* at 5:15:58.646 PM.

[43] *Id.* at 5:20:34.992 PM–5:21:15.488 PM.

[44] *See* Am. Compl. (Doc. 15) at 2.

[45] Ex. 2-D (Marshall Price Videos, Copy of Newsweek Video Release) to Am. Compl. (Doc. 15) at 2:38.

[46] In paragraph 12 of the Amended Complaint, Plaintiff alleges as follows: "At various times during the week in which Marshall Price died, [Nurses] . . . Crocker, . . . Foster, and Carter . . . examined or [were] consulted about [Mr. Price] when [he was] brought to one or more of them by various jail personnel. On each of those occasions, each individual [Turn Key] Defendant fell beneath the standard of care when each failed to immediately refer Mr. Price to the

## ANALYSIS

**I.      42 U.S.C. § 1983 claims**

The resolution of the § 1983 claims brought against Nurses Foster and Carter is pretty straightforward given what is alleged (and, more importantly, not alleged) in the Amended Complaint. With respect to Nurse Foster, there are no alleged facts that make it plausible that she knew of Mr. Price's ailments at any time before he left the Detention Center for the hospital. In the absence of such knowledge, Nurse Foster cannot be tagged with Eighth Amendment deliberate indifference or its Fourteenth Amendment counterpart.[47] With respect to Nurse Carter, there are no alleged facts that make it plausible that he knew of Mr. Price's ailments at any time prior to 4:40 PM on December 7, 2022. Moreover, as soon as Nurse Carter was informed of Mr. Price's ailments, Nurse Carter ordered Nurse Crocker to send Mr. Price to the hospital.[48] Ordering an inmate to the hospital as soon as you have any knowledge of his ailments is the exact opposite of Eighth Amendment deliberate indifference and its Fourteenth Amendment counterpart.[49]

---

emergency room." Am. Compl. (Doc. 15) ¶ 12. These allegations are vague and conclusory. When that week was Mr. Price seen by the medical staff? Who saw him? What was he seen for? What were his symptoms? Without answers to questions like these, the allegations as pled are of the type that can and should be ignored by a court—even at this stage of the proceedings. *See Wiles*, 280 F.3d at 870.

[47] *See Stewart v. Garcia*, 139 F.4th 698, 708 (8th Cir. 2025) (deliberate indifference "requires the official to have 'be[en] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, . . . and draw[n] the inference'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994))); *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009) ("The subjective component" of the test for deliberate indifference "requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, [an objectively serious medical] need."); *see also Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2009) ("Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment.").

[48] *See* Ex. 1 (Nurse Crocker Notes) to Mot. to Dismiss (Doc. 16-1) at 2.

[49] *See Cannon v. Dehner*, 112 F.4th 580, 587 (8th Cir. 2024) ("[I]n cases where some medical care is provided," a plaintiff must establish that "the course of treatment . . . so deviated from professional standards that it amounted to deliberate indifference." (quoting *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015))); *see also Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (mere negligence or medical malpractice is insufficient to constitute deliberate indifference). It is unclear if Plaintiff is trying to assert failure-to-train or failure-to-supervise § 1983 claims against Nurses Carter and Foster. As an initial matter, there is no *respondeat superior* liability under § 1983. *See Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998). Liability for failure to train only attaches "where (1) . . . training practices are inadequate; (2) [there] was deliberate[] indifferen[ce] to the rights of others in adopting them, such that the 'failure to train reflects a deliberate or conscious choice . . . ;' and (3) an alleged deficiency in . . . training procedures actually caused the plaintiff's injury." *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (quoting *City of Canton v. Harris*,

The § 1983 claim against Nurse Crocker is different. By about 11:00 AM on December 7, 2022, Nurse Crocker knew that Mr. Price (1) had fallen and hit his head on his bunk, (2) had an inch-wide gash on his head, (3) was dizzy, (4) was sweating profusely, (5) was pale in color, (6) was faint, (7) was short of breath, and (8) had an initial blood pressure of 70/60, which increased to 82/62 after sitting for ten minutes.[50] Given the state of the proceedings and the allegations in the Amended Complaint, we must assume that, knowing all this, Nurse Crocker sent Mr. Price back to his cell without any further medical evaluation or any medical treatment. We must further assume that Nurse Crocker did not have anyone check on Mr. Price for the next five hours. On these facts, the Court concludes that it is plausible that Nurse Crocker's conduct constituted deliberate indifference and violated Mr. Price's Eighth and/or Fourteenth Amendment rights.[51]

The combination of the very low blood pressure and the other symptoms noted above constituted an objectively serious medical need.[52] At a bare minimum, Mr. Price needed further

---

489 U.S. 378, 389 (1989)). Liability for failure to supervise attaches "only if a defendant demonstrated deliberate indifference or tacit authorization of the offensive acts." *Liebe*, 157 F.3d at 579 (quoting *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994)). Failure-to-train and failure-to-supervise claims "ultimately require the same analysis." *Id.* To the extent Plaintiff is trying to assert either or both types of claims, these claims would fail as currently pled. There are no allegations that Nurse Crocker had ever done anything in the past to show a specific need for correction or additional training. There are no allegations of past instances where Nurse Crocker acted outside of her license or failed to recognize obvious symptoms of an emergency. That's a problem for Plaintiff because "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference" on these types of claims. *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)). In the absence of such pled facts, any assertion of training or supervision failures on the part of Nurses Foster and Carter would be and are wholly conclusory.

[50] *See* Ex. 1 (Nurse Crocker Notes) to Mot. to Dismiss (Doc. 16-1) at 1.

[51] The Motion to Dismiss does not argue qualified immunity as a dismissal ground, so the Court will not address (1) whether qualified immunity could apply to a Turn Key employee in these circumstances, and (2) whether the qualified immunity doctrine would lead to a dismissal of the § 1983 claims against Nurse Crocker.

[52] "A serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)). When Mr. Price was evaluated by Nurse Crocker during the 11:00 AM medical visit, his blood pressure was significantly lower than the medically accepted threshold for hypotension. *See* Richard J. Chen et al., *Hypotension*, NATIONAL LIBRARY OF MEDICINE (May 3, 2025), https://www.ncbi.nlm.nih.gov/books/NBK499961/ ("Hypotension refers to a decrease in systemic blood pressure below normal levels. . . . [V]alues below 90/60 . . . are generally considered hypotensive.").

medical evaluation to determine how bad his condition was and whether he needed to be sent to the hospital immediately. Given the Amended Complaint's allegations, it is plausible that Nurse Crocker—being a nurse and knowing of all of Mr. Price's symptoms—knew of Mr. Price's objectively serious medical need. In such circumstances, sending Mr. Price back to his cell with no further evaluation or treatment (and then not checking on him for hours) disregarded a known substantial risk to Mr. Price's safety.[53] That's enough to state a viable § 1983 claim.[54]

---

His blood pressure was still hypotensive at the time he was returned to his cell. *See id.*; Am. Compl. (Doc. 15) ¶ 15. Combined with Mr. Price's other symptoms—severe sweating, dizziness, pallor, shortness of breath, and his one-inch open head wound—this is enough for a layperson to easily recognize that Mr. Price required a doctor's attention. *Cf. Keedy v. L/N/U*, No. 23-cv-00558, 2023 U.S. Dist. LEXIS 104191, at *6–7 (M.D. Tenn. June 15, 2023) (allowing *in forma pauperis* deliberate-indifference claim alleging dangerously low blood pressure to proceed); *Davis v. Buchanan County*, No. 17-cv-06058, 2019 WL 7116360, at *13 (W.D. Mo. Dec. 23, 2019) (reasonable jury could conclude doctor was deliberately indifferent to serious medical needs of prisoner with history of Addison's disease because doctor failed to order immediate administration of medicine when prisoner experienced fainting, chest pain, nausea, vomiting, low blood pressure, and dizziness); *Brown v. Boothe*, No. CIV-17-428, 2018 U.S. Dist. LEXIS 155496, at *14 (W.D. Okla. July 31, 2014) (allowing *in forma pauperis* deliberate-indifference claim alleging failure to act on signs of distress, including low blood pressure, to proceed), *report and recommendation adopted by Brown v. Boothe*, No. CIV-17-428, 2018 U.S. Dist. LEXIS 155093 (W.D. Okla. Sept. 12, 2018); *Yarbrough v. Morgan*, No. 13cv613, 2016 WL 10650413, at *5, *7 (N.D. Fla. Aug. 25, 2016) (finding "beyond any reasonable doubt" that prisoner had objectively serious medical need as evidenced by elevated heart rate, low blood pressure, extensive pain, weakness, uncontrolled blood sugar, nausea, vomiting, diarrhea, and mottled skin).

[53] *Cf. Keedy*, 2023 U.S. Dist. LEXIS 104191, at *6–7; *Davis*, 2019 WL 7116360, at *13; *Brown*, 2018 U.S. Dist. LEXIS 155496, at *14.

[54] The Court does not believe that Nurse Crocker's conduct during her 4:32 PM encounter with Mr. Price constituted deliberate indifference under the Eighth Amendment or a violation of its Fourteenth Amendment counterpart. Nurse Crocker took ten minutes to assess Mr. Price's condition in the cell block and then (at 4:41 PM) brought him to medical for further evaluation. *See supra* p. 5. During or after that further evaluation, she contacted Nurse Carter, who directed her to immediately take Mr. Price to the hospital. *See supra* p. 6. She followed these instructions in a timely fashion. *See id.* Regardless of whether Nurse Crocker should have acted more quickly during any part of this encounter, nothing suggests she was ignoring the situation or delaying care in a criminally reckless manner. *Cf. Jenkins v. County of Hennepin*, 557 F.3d 628, 632 (8th Cir. 2009) (district court did not err when it found that delaying x-ray on prisoner's broken jaw for one or two days did not constitute deliberate indifference); *Hartsfield v. Colburn*, 491 F.3d 394, 396–98 (8th Cir. 2007) (month-long treatment delay of necessary oral surgery caused, in part, by doctor and nurse miscommunication was "evidence of negligence that does not rise to unconstitutional deliberate indifference"); *Logan v. Clarke*, 119 F.3d 647, 650 (8th Cir. 1997) ("Although the prison doctors may not have proceeded . . . as quickly as hindsight perhaps allows us to think they should have, their actions were not deliberately indifferent. The doctors made efforts to cure the problem in a reasonable and sensible manner."); *see also Coleman v. Sweetin*, 745 F.3d 756, 765–66 (5th Cir. 2014) (reversing dismissal of deliberate-indifference claim where prisoner alleged roughly one-month delay between fracturing his hip and receiving medical treatment); *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007) (finding that "a reasonable jury could have concluded . . . that the [several-hour] delay [in providing medical treatment] unnecessarily prolonged and exacerbated [the plaintiff's] pain and unnecessarily prolonged his high blood pressure"); *Thomas v. Moore*, No. 23-cv-1937, 2024 U.S. Dist. LEXIS 94090, *8–9 (M.D. Fla. May 28, 2024) (finding plaintiff successfully stated deliberate indifference claim when he alleged a roughly one-day delay between suffering a fractured hip and being sent to the hospital).

Moving on to the § 1983 claims against Turn Key itself, those claims can only be viable if (1) Turn Key failed to train or supervise Nurse Crocker in a way that led to the (plausible) constitutional violation just discussed or (2) Turn Key had a policy, practice, or custom that caused the (plausible) constitutional violation just discussed.[55] The failure-to-supervise and failure-to-train theories don't work for the reasons the Court already explained in note 49 *supra*. And the policy, practice, or custom theory doesn't work because the Amended Complaint doesn't allege sufficient facts to make such a claim plausible. The only thing the Amended Complaint does allege in this vein is that "the Sheriff and [Turn Key] routinely required, by policy and custom, LPN's to perform tasks for which the Sheriff and [Turn Key] knew these LPN's could not legally do, like exercise nursing judgment."[56] But that allegation is the very quintessence of conclusory. There are no actual facts alleged to back up that conclusion.

In light of the foregoing, and with respect to the § 1983 claims alleged against the nurses and Turn Key, the only claim to move forward is the individual-capacity claim against Nurse Crocker. The rest are dismissed without prejudice.[57]

---

[55] *See Johnson v. Blaukat*, 453 F.3d 1108, 1114 (8th Cir. 2006) ("A [§ 1983] claim . . . is sustainable only where a constitutional violation has been committed pursuant to an official custom, policy, or practice); *Liebe*, 157 F.3d at 579 (laying out the legal standard for failure-to-train and failure-to-supervise claims). Turn Key can't be held vicariously liable for the actions of its employees because there is no *respondeat superior* liability under § 1983. *See Liebe*, 157 F.3d at 579. Put another way, Turn Key can only be held liable for actions it took as an individual entity (like adopting unconstitutional policies).

[56] Am. Compl. (Doc. 15) ¶ 22.

[57] Plaintiff brought ACRA claims that mirror the § 1983 claims. *See* Am. Compl. (Doc. 15) ¶ 20. The Court resolves these ACRA claims in the same way and for the same reasons as it resolves the § 1983 claims because "the ACRA is generally treated as coextensive with § 1983 and analyzed under federal standards . . . ." *McDaniel v. Neal*, 44 F.4th 1085, 1093 (8th Cir. 2022); *see also Muntaqim v. Payne*, 2021 Ark. 162, at *5, 628 S.W.3d 629, 635 ("In construing ACRA, [the Arkansas Supreme Court] may look for guidance to state and federal decisions interpreting . . . § 1983.").

Plaintiff also brought claims under sections 2, 6, and 9 of article 2 of the Arkansas Constitution. Am. Compl. (Doc. 15) ¶ 20. To the extent Plaintiff's claims are rooted in article 2, section 2 of the Arkansas Constitution, those claims are dismissed for the reasons outlined *infra* note 68. To the extent Plaintiff's claims are rooted in article 2, section 6 of the Arkansas Constitution—which concerns the freedom of speech, the press, and libel—Plaintiff has clearly not alleged facts sufficient to state a plausible claim under that section of the Arkansas Constitution. And to the extent that Plaintiff's claims are rooted in article 2, section 9 of the Arkansas Constitution, the Court resolves these state-constitutional claims in the same way and for the same reasons it resolves the § 1983 claims because Arkansas

## II.    ADA/§ 504 Claims Against Turn Key

Plaintiff's claims against Turn Key brought under Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act of 1973 are not viable. There are no alleged facts that make it plausible that Mr. Price was (1) denied access to medical care because of a disability or (2) denied a reasonable accommodation.[58] Said a little differently, there's nothing to suggest that Mr. Price was discriminated against on the basis of a disability.

We know Nurse Crocker performed an initial medical evaluation of Mr. Price at around 11:00 AM on December 7, 2022.[59] Plaintiff's complaint is that Mr. Price didn't get further medical evaluation or treatment at that time or anytime afterwards (until 4:30 PM or so). But there is absolutely nothing in the Amended Complaint that suggests that the reason Mr. Price didn't get further medical evaluation or treatment was Mr. Price's disability.[60] In *Deweese v. Munyan*, this Court explained why allegations like the ones made in the Amended Complaint in our case don't state viable ADA/§ 504 claims.[61] The Court adopts that same analysis here.

Plaintiff contends that *Deweese* was wrongly decided.[62] But Plaintiff's argument is unpersuasive. Her argument relies nearly exclusively on a 2023 Eighth Circuit case titled *Hall v. Higgins*.[63] In *Hall*, the Eighth Circuit explained that it would be a potential ADA/§504 violation

---

courts have "traditionally interpreted article 2, section 9 in a manner consistent with federal Eighth Amendment jurisprudence." *Harmon v. Payne*, 2020 Ark. 17, at *6, 592 S.W.3d 619, 623.

[58] *See Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) ("[T]o state a *prima facie* case under either the ADA or [§ 504,] . . . a plaintiff must show: 1) he is a person with a disability as defined by statute; 2) he is otherwise qualified for the benefit in question; and 3) he was excluded from the benefit due to discrimination based upon disability.").

[59] *See supra* pp. 2–4.

[60] The Amended Complaint doesn't even tell us what disability Mr. Price has. The Court is assuming that the disability is the injury Mr. Price had on December 7, 2022. It is not entirely clear that qualifies as a disability for purposes of the ADA/§ 504. But the Court will treat it as if it does for purposes of deciding the instant Motion.

[61] *Deweese v. Munyan*, 20-cv-00818, 2021 WL 729097, at *3–5 (E.D. Ark. Feb. 24, 2021).

[62] Br. in Opp'n to Mot. to Dismiss (Doc. 26) at 18.

[63] *See id.* (citing *Hall v. Higgins*, 77 F.4th 1171, 1182 (8th Cir. 2023)).

if a jail failed to accommodate an inmate's mobility issues and this failure prevented the inmate from attending medical appointments in the jail.[64]  That is nothing like the case at bar, where Plaintiff was taken to and seen in the medical unit at around 11:00 AM and then again at around 4:30 PM.

Plaintiff says that, even though Mr. Price went to medical, there was still a denial of access to medical care.[65]  According to Plaintiff, the problem (that resulted in a denial of medical care) was that Mr. Price "did not receive an appropriate screening" at the times he went to medical.[66]  But, even putting aside the conclusory nature of such an allegation, Plaintiff never links this "inappropriate screening" problem to discrimination against, or failure to accommodate, a disability.  In *Hall*, that link was clear: Mr. Hall couldn't physically get to his medical appointments because the jail did not reasonably accommodate his mobility issues.[67]  In our case, on the other hand, we are left to merely speculate about how the (allegedly) inappropriate screenings constitute disability discrimination or a failure to reasonably accommodate.  And we can't use speculation to fill in the missing links.

At bottom, this is a square-peg-round-hole situation.  Plaintiff's ADA/§504 claims are just not viable.[68]

---

[64] *Hall*, 77 F.4th at 1181–82.

[65] *See* Br. in Opp'n to Mot. to Dismiss (Doc. 26) at 18.

[66] *Id.*

[67] *See Hall*, 77 F.4th at 1181–82.

[68] If Plaintiff is bringing claims under any state analog to the ADA/§504 (for example an ACRA claim related to disability discrimination), such claims are dismissed for the same reason as the federal ADA/§504 claims are being dismissed.  *See Alexander v. E. Tank Servs., Inc.*, 2016 Ark. App. 544, at *11, 505 S.W. 239, 245 ("ACRA [disability discrimination] claims are analyzed under the same principles as ADA claims.").  Similarly, if Plaintiff is trying to bring a federal or state claim predicated on an equal-protection violation, such claims are dismissed because (as explained in the ADA/§504 analysis provided above) there are no facts alleged to make any type of discrimination plausible here.

**III.     Remaining State Law Claims**

In footnotes 57 and 68 *supra*, the Court has resolved the portion of Plaintiff's state-law claims that are predicated on ACRA and the state constitution. But these are not the only state-law claims Plaintiff brings against Turn Key and the nurses. As to all the other state-law claims, the Motion to Dismiss argues (in a single line of the opening brief) that the Court should decline supplemental jurisdiction. The Court disagrees. Here's why.

Under 28 U.S.C. § 1367(a), "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Federal and state law claims form part of the same case or controversy when they "derive from a common nucleus of operative fact."[69] But under § 1367(c), the Court has the discretion to:

> decline to exercise supplemental jurisdiction over a claim if . . . (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.[70]

When deciding whether to exercise supplemental jurisdiction, a district court should consider "judicial economy, convenience, and fairness to litigants . . . ."[71]

Earlier in today's Order, the Court concluded that the individual-capacity federal and state deliberate-indifference claims against Nurse Crocker are moving forward. And because the Greene County Defendants did not file a motion to dismiss, all the claims against them (in their individual and official capacities) are moving forward as well. In the Court's view, the unresolved

---

[69] *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

[70] 28 U.S.C. § 1367(c).

[71] *Gibbs*, 383 U.S. at 726.

13

state-law medical malpractice/negligence/wrongful death claims against Turn Key, Nurse Carter, Nurse Foster, and Nurse Crocker are "so related" to the live claims against Nurse Crocker and the Greene County Defendants "that they form part of the same case or controversy under Article III of the United States Constitution."[72]  At the very least, it should be clear to everyone that the surviving deliberate-indifference claims against Nurse Crocker arise from the same "common nucleus of operative fact" as do the medical malpractice claims against Turn Key, Nurse Carter, Nurse Foster, and Nurse Crocker.  This makes supplemental jurisdiction over all surviving state-law claims brought by Plaintiff appropriate in the instant case.[73]

## CONCLUSION

The Motion to Dismiss[74] is DENIED with respect to the § 1983 and ACRA deliberate-indifference claims against Nurse Crocker individually.[75]  The Motion is also DENIED with respect to the state-law medical malpractice/negligence/wrongful death claims against Turn Key and Nurses Carter, Foster, and Crocker.  These are the only claims (with respect to the moving Defendants) on which the Court intends to move forward.  With respect to all other claims against Turn Key and Nurses Carter, Foster, and Crocker, the Motion to Dismiss is GRANTED.[76]

---

[72] 28 U.S.C. § 1367(a)

[73] If any or all of the federal claims that now proceed to discovery are resolved against Plaintiff at the summary judgment phase of this case, the Court will reconsider at that point whether it should still exercise supplemental jurisdiction over any then-live state-law claims.

[74] Doc. 16.

[75] *But see supra* note 54.  The portion of the § 1983 and ACRA deliberate-indifference claims against Nurse Crocker individually that relate to Nurse Crocker's conduct during or after the 4:32 PM encounter with Mr. Price cannot move forward.

[76] Within 21 days of the date of this Order, Plaintiff may file a Motion for Leave to Amend the Complaint if she believes she can add facts that would fix the deficiencies identified concerning one or more of the dismissed claims.  The Motion must comply with all applicable federal and local rules.  Finally, as a reminder and per note 5 *supra*, Plaintiff is ordered to inform the Court within 14 days of the date of this Order whether she has properly and timely served Deputy Floyd.

IT IS SO ORDERED this 21st day of August 2025.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE